**No. 26-12553**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

CLOVER INSURANCE COMPANY,

Plaintiff-Appellee,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Southern District of Georgia

# OPENING BRIEF FOR APPELLANTS

*Of Counsel:*

*ROBERT FOX FOSTER*
*Acting General Counsel*
*ELIZABETH C. KELLEY*
*Deputy General Counsel*
*Chief Legal Officer for CMS*
*BETSY M. PELOVITZ*
*Associate General Counsel*
*MICHAEL J. GERARDI*
*Deputy Associate General Counsel*
*For Litigation*
*ALEXANDER R. WHITE*
*KENNETH R. WHITLEY*
*Attorneys*

*BRETT A. SHUMATE*
*Assistant Attorney General*

*THOMAS PULHAM*
*JACK STARCHER*
*Attorneys, Appellate Staff*
*Civil Division, Room 7515*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8877*

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for defendants-appellants, the U.S. Department of Health and Human Services, et al., certify that the following have an interest in the outcome of this appeal:

- Beer, Jocelyn (U.S. Dept. of Health and Human Services)
- Centers for Medicare & Medicaid Services
- Clover Health Investments, Corp. (CLOV)
- Clover Insurance Company
- Durham, James B. (Hall, Booth & Smith, PC)
- Foster, Robert Fox (U.S. Dept. of Health and Human Services)*
- Freeman, Mark R. (U.S. Dept. of Justice)
- Gerard, Michael J. (U.S. Dept. of Health and Human Services)*
- Graves, Leigh (U.S. Dept. of Health and Human Services)
- Kelley, Elizabeth C. (U.S. Dept. of Health and Human Services)*
- Kennedy, Robert F., Jr. (U.S. Dept. of Health and Human Services)
- Latham & Watkins LLP
- Leithart, Otto Woelke (U.S. Dept. of Justice)

* Additions to previous certificate marked with an asterisk.

- McArthur, Eric D. (U.S. Dept. of Justice)
- Oz, Mehmet (Centers for Medicare & Medicare Services)
- Patrick, Bradford (U.S. Dept. of Justice)
- Pelovitz, Betsy M. (U.S. Dept. of Health and Human Services)*
- Prins, Andrew D. (Latham & Watkins LLP)
- Pulham, Thomas (U.S. Dept. of Justice)
- Roddy, Kirsten (U.S. Dept. of Health and Human Services)
- Schlossman, Nicholas L. (Latham & Watkins LLP)
- Shumate, Brett A. (U.S. Dept. of Justice)
- Starcher, Jack (U.S. Dept. of Justice)
- United States Department of Health and Human Services
- United States of America
- Westmoreland, Rachael Lynn (Latham & Watkins LLP)
- Wood, Hon. Lisa G.
- White, Alexander (U.S. Dept. of Health and Human Services)
- Whitley, Kenneth (U.S. Dept. of Health and Human Services)

AUGUST 2026

## STATEMENT REGARDING ORAL ARGUMENT

While the district court's errors in concluding that venue was appropriate are sufficiently clear to warrant reversal without argument, the district court's later summary judgment decision presents questions of statutory interpretation that would benefit from oral argument.

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....... 1

STATEMENT OF JURISDICTION ....... 2

STATEMENT OF THE ISSUES ....... 3

STATEMENT OF THE CASE ....... 4

A. Statutory Background ....... 4

B. Factual Background ....... 9

C. Prior Proceedings ....... 10

D. Standard of Review ....... 14

SUMMARY OF ARGUMENT ....... 15

STANDARD OF REVIEW ....... 25

ARGUMENT ....... 18

I. Venue Is Improper in the Southern District of Georgia ....... 18

A. The Acts or Omissions that Gave Rise to Plaintiff's Claims All Took Place in or Near Washington, DC ....... 21

B. The In-District Acts Identified by the District Court Did Not "Give Rise" to Any Claim ....... 26

C. The In-District Acts Are Not a Substantial Part of the Relevant Events ....... 31

II. Star Ratings Measures Do Not Trigger § 1395hh(a)(2)'s Notice and Comment Requirement ....................36

A. Star Ratings Have No Effect on "Payment[s] for Services" ....................36

B. Neither of the Alternative Arguments Plaintiff Pressed Below Withstand Scrutiny ....................43

III. Section 1395w-23(o)(4)(A) Does Not Require CMS to Calculate Star Ratings Based Exclusively on Particular Data ....................46

IV. The Court Further Erred in Ordering CMS to Recalculate Plaintiff's Star Rating....................60

CONCLUSION ....................65

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Advance Tr. & Life Escrow Servs., LTA v. Protective Life Ins. Co.*,
93 F.4th 1315 (11th Cir. 2024) .......... 48

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*,
789 F.3d 1206 (11th Cir. 2015) .......... 64

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) .......... 62

*Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*,
571 U.S. 49 (2013) .......... 20

*Awad v. Mayorkas*,
2022 WL 1215521 (M.D. Fla. Apr. 7, 2022),
*report and recommendation adopted*,
2022 WL 1212803 (M.D. Fla. Apr. 25, 2022) .......... 25

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) .......... 38

*Bates v. C & S Adjusters, Inc.*,
980 F.2d 865 (2d. Cir. 1992) .......... 24

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) .......... 20

*Commissioner v. Kelley*,
293 F.2d 904 (5th Cir. 1961) .......... 33

*Cooper v. Blue Cross*,
19 F.3d 562 (11th Cir. 1994) .......... 48, 51, 52

*Cottman Transmission Sys., Inc. v. Martino*,
36 F.3d 291 (3d Cir. 1994) .......... 24, 31, 35

*Di Giovanni v. Camden Fire Ins. Ass'n*,
296 U.S. 64 (1935) .......... 63

*Gulf Ins. Co. v. Glasbrenner*,
417 F.3d 353 (2d Cir. 2005) .......... 20, 31, 35

*HM Fla.-ORL, LLC v. Governor of Fla.*,
2026 WL 2235960 (11th Cir. Aug. 4, 2026) .......... 59

*Holland v. Florida*,
560 U.S. 631 (2010) .......... 61

*Home Ins. Co. v. Thomas Indus., Inc.*,
896 F.2d 1352 (11th Cir. 1990) .......... 19

*Hubbard, In re*,
803 F.3d 1298 (11th Cir. 2015) .......... 50

*Hughes v. United States*,
584 U.S. 675 (2018) .......... 47, 48

*Humana Inc. v. U.S. Dep't of Health & Hum. Servs.*,
806 F. Supp. 3d 642 (N.D. Tex. 2025) .......... 38, 44

*Iraola & CIA, SA v. Kimberly Clark Corp.*,
232 F.3d 854 (11th Cir. 2000) .......... 52

*Jenkins Brick Co. v. Bremer*,
321 F.3d 1366 (11th Cir. 2003) .......... 20, 21, 23, 26, 27, 28, 29, 30, 31

*Kulakowski, In re*,
735 F.3d 1296 (11th Cir. 2013) .......... 50

*Lamie v. U.S. Tr.*,
540 U.S. 526 (2004) .......... 58

*Leroy v. Great W. United Corp.*,
443 U.S. 173 (1979) .......... 20, 23, 24, 30

*Life Techs. Corp. v. Promega Corp.*,
580 U.S. 140 (2017) .......... 33

*MSP Recovery Claims, Series LLC v. Metropolitan Gen. Ins. Co.*,
40 F.4th 1295 (11th Cir. 2022) .......... 39, 42, 43

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
918 F.3d 1312 (11th Cir. 2019) ........................................................ 59

*Ngonga v. Sessions*,
318 F. Supp. 3d 270 (D.D.C. 2018) ................................................ 25

*Polycarpe v. E&S Landscaping Serv., Inc.*,
616 F.3d 1217 (11th Cir. 2010)..........................................................47

*Pottinger v. City of Miami*,
40 F.3d 1155 (11th Cir. 1994) .......................................................... 14

*Rogers v. Civil Air Patrol*,
129 F. Supp. 2d 1334 (M.D. Ala. 2001) ........................................... 25

*Salmeron-Salmeron v. Spivey*,
926 F.3d 1283 (11th Cir. 2019) ........................................................ 64

*Saregama India Ltd. v. Mosley*,
635 F.3d 1284 (11th Cir. 2011) ........................................................ 14

*SE Prop. Holding, LLC v. Welch*,
65 F.4th 1335 (11th Cir. 2023) ......................................................... 57

*Seariver Mar. Fin. Holdings, Inc. v. Pena*,
952 F. Supp. 455 (S.D. Tex. 1996) ................................................... 25

*Slam Dunk I, LLC v. Connecticut Gen. Life Ins. Co.*,
853 F. App'x 451 (11th Cir. 2021) .................................................. 48

*Sphinx Int'l, Inc. v. National Union Fire Ins. Co.*,
412 F.3d 1224 (11th Cir. 2005)..........................................................59

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) .......................................................................... 61

*Tobien v. Nationwide Gen. Ins. Co.*,
133 F.4th 613 (6th Cir. 2025) .................................................... 19, 30

*U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*,
749 F.3d 967 (11th Cir. 2014) .......................................................... 47

*United States v. Brown*,
996 F.3d 1171 (11th Cir. 2021) ........................................................ 50, 51

*United States v. Coastal Ref. & Mktg., Inc.*,
911 F.2d 1036 (5th Cir. 1990) ................................................................ 62

*United States v. Dawson*,
64 F.4th 1227 (11th Cir. 2023) ............................................................... 49

*United States v. Muench*,
153 F.3d 1298 (11th Cir. 1998) ............................................................... 14

*United States v. Schwarzbaum*,
24 F.4th 1355 (11th Cir. 2022) ............................................................... 63

*United States ex rel. Harvey Gulf Int'l Marine, Inc. v. Maryland Cas. Co.*,
573 F.2d 245 (5th Cir. 1978) ................................................................. 20

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
985 F.2d 1148 (2d Cir. 1993) ................................................................. 48

*Vogt v. State Farm Life Ins. Co.*,
963 F.3d 753 (8th Cir. 2020)...................................................................48

*Wild, In re*,
994 F.3d 1244 (11th Cir. 2021) ............................................................... 58

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ................................................................................ 63

*Wolfram Alpha LLC v. Cuccinelli*,
490 F. Supp. 3d 324 (D.D.C. 2020) .......................................................... 25

*Woodke v. Dahm*,
70 F.3d 983 (8th Cir. 1995) ............................................................ 27, 29

**Statutes:**

Administrative Procedure Act (APA),
5 U.S.C. § 706 ................................................................................... 63

Social Security Act:
42 U.S.C. § 1395 *et seq.* ..................... 4
42 U.S.C. § 1395c ..................... 4
42 U.S.C. § 1395d ..................... 39
42 U.S.C. § 1395k(a) ..................... 39
42 U.S.C. § 1395m(c)(2)(B)(i) ..................... 56
42 U.S.C. § 1395w-21(a)(1) ..................... 4
42 U.S.C. § 1395w-21(b) ..................... 4
42 U.S.C. § 1395w-21(d)(1) ..................... 28, 53
42 U.S.C. § 1395w-21(d)(4) ..................... 53
42 U.S.C. § 1395w-21(d)(4)(D) ..................... 28, 53
42 U.S.C. § 1395w-22(a)(1)(A) ..................... 40, 41
42 U.S.C. § 1395w-22(a)(1)(B) ..................... 38, 41
42 U.S.C. § 1395w-22(a)(3)(A) ..................... 45
42 U.S.C. § 1395w-22(a)(5) ..................... 40
42 U.S.C. § 1395w-22(e)(1) ..................... 46
42 U.S.C. § 1395w-22(e)(3) ..................... 5
42 U.S.C. § 1395w-22(e)(3)(A)(i) ..................... 13, 46
42 U.S.C. § 1395w-22(e)(3)(B)(iii) ..................... 53
42 U.S.C. § 1395w-23 .....................40
42 U.S.C. § 1395w-23(a)(1)(A) ..................... 4, 40
42 U.S.C. § 1395w-23(a)(1)(B)(i) ..................... 41
42 U.S.C. § 1395w-23(a)(1)(B)(ii) ..................... 5
42 U.S.C. § 1395w-23(a)(1)(C) ..................... 4
42 U.S.C. § 1395w-23(b)(2) ..................... 7
42 U.S.C. § 1395w-23(c)(4)-(5) ..................... 51
42 U.S.C. § 1395w-23(n) ..................... 5
42 U.S.C. § 1395w-23(o)(1) ..................... 9
42 U.S.C. § 1395w-23(o)(4)(A) ..................... 3, 5, 6, 8, 10, 12, 46, 57
42 U.S.C. § 1395w-23(o)(4)(D)(ii) ..................... 55
42 U.S.C. § 1395w-24(b)(1)(C) ..................... 9
42 U.S.C. § 1395w-24(b)(1)(C)(v) ..................... 6
42 U.S.C. § 1395w-24(b)(2)(A) ..................... 5
42 U.S.C. § 1395w-101 ..................... 4
42 U.S.C. § 1395w-101(c)(1) ..................... 28
42 U.S.C. § 1395x(a) ..................... 37
42 U.S.C. § 1395x(b) ..................... 37

42 U.S.C. § 1395x(k) .... 37
42 U.S.C. § 1395x(u) .... 37
42 U.S.C. § 1395hh(a)(2) .... 3, 10, 12, 16, 36, 39
42 U.S.C. § 1395mm(a)(1)(B) .... 56
42 U.S.C. § 1395rr-1(e)(3)(B) .... 56, 57

28 U.S.C. § 1406(a) .... 35

28 U.S.C. § 1291 .... 3

28 U.S.C. § 1331 .... 2

28 U.S.C. § 1391 .... 20

28 U.S.C. § 1391(e) .... 18

28 U.S.C. § 1391(e)(1) .... 19

28 U.S.C. § 1391(e)(1)(B) .... 10, 15, 21, 31

**Regulations:**

42 C.F.R. § 400.202 .... 38

42 C.F.R. § 422.162(b) .... 6

42 C.F.R. § 422.164 .... 7

42 C.F.R. § 422.164(c) .... 7, 8

42 C.F.R. § 422.166 .... 6

42 C.F.R. § 422.166(h)(1)(ii) .... 6

42 C.F.R. § 422.254 .... 5

42 C.F.R. § 422.258 .... 5

42 C.F.R. § 422.260 .... 9

42 C.F.R. § 422.266 .... 9

42 C.F.R. § 422.266(b) ....................42, 45

42 C.F.R. § 422.510(a) .................... 44

42 C.F.R. § 422.510(a)(4)(xi) .................... 43, 44

**Other Authorities:**

*Advance Notice of Methodological Changes for Calendar Year (CY) 2026 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies* (Jan. 10, 2025), https://perma.cc/KWB8-VLWK ....................22

Anthem, *What Is Medicare?* https://perma.cc/PXF2-B4ZV ....................39

*Base*, Black's Law Dictionary 180 (10th ed. 2014) ....................47

CMS, *Advance Notice of Methodological Changes for Calendar Year (CY) 2026 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies* (Jan. 10, 2025), https://perma.cc/KWB8-VLWK .................... 6

CMS, *Medicare 2026 Part C & D Star Ratings Technical Notes*, https://perma.cc/QP9G-E7X9 ....................8, 23

Juliette Cubanski et al., *Medicare 101*, KFF (Oct. 6, 2025) ....................39

69 Fed. Reg. 46,866 (Aug. 3, 2024) .................... 7

83 Fed. Reg. 16,440 (Apr. 16, 2018) .................... 6, 7, 53, 54

*Govern*, Black's Law Dictionary (12th ed. 2024)....................44

Humana, *Medicare Advantage vs. Original Medicare: Which Option Should I Choose?* (May 28, 2026), https://perma.cc/JYE5-T35D....................39

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)....................58

*Venue*, Black's Law Dictionary (12th ed. 2024) ................................................18

14D *Wright & Miller's Federal Practice & Procedure* § 3801
(4th ed.) ..........................................................................................................14

## INTRODUCTION

This lawsuit concerns the Medicare Parts C and D Quality Star Rating system, which allows Medicare beneficiaries to comparison shop among hundreds of available private health insurance companies offering benefit plans under Part C (also known as Medicare Advantage) and prescription drug plans under Part D. Plaintiff—a New Jersey company—brought this challenge in the Southern District of Georgia, challenging various decisions made by the Centers for Medicare & Medicaid Services (CMS) in establishing the measures and data it used for the 2026 Star Ratings.

The district court erred in multiple respects in the course of resolving this suit. At the outset, the court never should have addressed the merits at all. The district court badly misapplied this Court's precedents in denying defendants' motion to dismiss for improper venue. The district court concluded that a "substantial part of the act or omissions" giving rise to this Administrative Procedure Act (APA) challenge took place in the Southern District of Georgia, but in fact no relevant acts or omissions took place in the district, let alone a "substantial part" of them.

In later granting summary judgment to plaintiff, the district court then committed clear errors of statutory interpretation. The court

disregarded binding, on-point precedent of this Court in concluding that the ordinary meaning of the phrase "based on" can be "based exclusively on." And the court misunderstood the meaning of the term "services" in the Medicare context, erroneously conflating that term—which refers to medical care provided by hospitals and other healthcare providers—with the entirely distinct concept of "benefits"—which refers to insurance coverage provided by entities like plaintiff.

Because this case never should have made it past defendants' motion to dismiss for improper venue, this Court should remand with instructions to dismiss or transfer this case to a proper venue. In the alternative, if this Court reaches the merits of the district court's summary judgment decision, it should correct the district court's clear errors of statutory interpretation and vacate the judgment.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. On May 27, 2026, the district court granted plaintiff's motion for summary judgment. Dkt. No. 61. On May 29, the court granted in part and denied in part the government's motion for reconsideration of that order. Dkt. No.

64. The government filed a timely notice of appeal on July 21, 2026. Dkt. No. 67. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in holding that venue was proper in the Southern District of Georgia, where no relevant acts or omissions giving rise to plaintiff's claims—let alone a "substantial part" of them—occurred.

2. Whether the district court erred in concluding that "payment for services," as used in 42 U.S.C. § 1395hh(a)(2) of the Medicare statute, encompasses payments from the government to Medicare Advantage Organizations in exchange for providing insurance coverage to beneficiaries.

3. Whether the district court erred in concluding that 42 U.S.C. § 1395w-23(o)(4)(A), which provides that CMS shall calculate Star Ratings "based on" certain data, requires CMS to calculate Star Ratings based *exclusively* on those data.

4. Whether the district court erred in ordering CMS to calculate plaintiff's Star Rating based on an artificial, cherrypicked list of measures that bears no relationship to the statutory defects the court identified.

## STATEMENT OF THE CASE

### A. Statutory Background

Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. (Medicare statute), establishes the Medicare program, a federally funded and administered health insurance program for eligible elderly and disabled persons and certain individuals with end-stage renal disease. *See id.* § 1395c. CMS, a component agency of the United States Department of Health and Human Services (HHS), administers the Medicare program. The Medicare program is divided into four major components. As relevant here, under Medicare Parts C and D, the government contracts with private entities known as "Medicare Advantage Organizations" or "MAOs" that provide insurance to Medicare beneficiaries within a particular geographic area. *See id.* § 1395w-21(b). Under Medicare Part C, the government pays MAOs a predetermined sum, adjusted for the demographic and health characteristics of each beneficiary, for providing the same coverage through a Medicare Advantage plan that the beneficiary would receive under Parts A and B. *Id.* § 1395w-23(a)(1)(A), (C). Some MAOs also contract to provide subsidized prescription drug coverage to beneficiaries under Medicare Part D. *See id.* § 1395w-101.

CMS pays MAOs a per-beneficiary-per-month fixed amount in exchange for the MAOs' furnishing of insurance benefits to Medicare beneficiaries who enroll in their plan. To calculate these payments, CMS first determines a "benchmark" based on the per capita cost of covering Medicare beneficiaries under Parts A and B in the relevant geographic area. *Id.* § 1395w-23(n); 42 C.F.R. § 422.258. Each MAO then submits a "bid" to CMS for each contract, indicating the payment the MAO will accept to cover a beneficiary with an average risk profile in that area. 42 C.F.R. § 422.254. If the MAO's bid is less than the benchmark, the bid becomes the MAO's "base payment," and the MAO receives a "rebate" calculated from the amount by which its bid is lower than the benchmark. If the MAO's bid is greater than the benchmark, the benchmark becomes the MAO's base payment, and the MAO must charge beneficiaries a premium to cover the difference. *See* 42 U.S.C. §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A).

Congress has directed CMS to rate the quality of Medicare Advantage plans every year using "a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)." 42 U.S.C. § 1395w-23(o)(4)(A); *see also id.* § 1395w-22(e)(3). Star Ratings reflect the experiences

of beneficiaries in these plans and assist beneficiaries in finding the best plans for their needs. CMS, *Advance Notice of Methodological Changes for Calendar Year (CY) 2026 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies* 109 (Jan. 10, 2025), https://perma.cc/KWB8-VLWK (2026 Star Rating Methodologies).

CMS assigns an overall Star Rating to each individual contract held by a MAO, and each plan offered under that contract receives the contract's rating. *See* 42 C.F.R. §§ 422.162(b), 422.166, 423.182(b), 423.186. MAO contracts—the formal agreement between CMS and the MAO to offer Medicare Advantage plans—can include multiple individual insurance plans, which describe the specific package of benefits offered to beneficiaries. The Star Ratings use a scale from one to five stars with half-star increments. *See* 42 U.S.C. §§ 1395w-23(o)(4)(A), 1395w-24(b)(1)(C)(v); 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii).

To calculate Star Ratings, CMS scores each Medicare Advantage contract on 30 to 45 quality measures. To calculate these measure scores, CMS uses a variety of different data sources. 83 Fed. Reg. 16,440, 16,520, 16,525 (Apr. 16, 2018). Most measures relevant to Part C are drawn from data collected by plans as part of their statutorily required quality

improvement programs. Those data include data collected from Consumer Assessment of Healthcare Providers and Systems (CAHPS), the Healthcare Effectiveness Data and Information Set (HEDIS), and the Health Outcomes Survey (HOS), widely used surveys that also gather data outside of Medicare Advantage. *See* 69 Fed. Reg. 46,866, 46,866 (Aug. 3, 2024). Some other measures relevant to Part C and all measures relevant to Part D incorporate other sources of information on plan quality that are not collected from plans but are readily available from CMS administrative data, like data from CMS prescription claims.

CMS has promulgated descriptions of all the measures used to calculate the Star Ratings through notice-and-comment rulemaking. In 2018, CMS codified via rulemaking descriptions of the then-extant Star Ratings measures and created a regulation—42 C.F.R. § 422.164—describing how CMS will add, remove, and modify measures going forward. *See* 83 Fed. Reg. at 16,538-54. CMS uses its annual Advance Notice and Rate Announcement process, which provides MAOs with notice and the opportunity to comment, to "announce potential new measures." *See* 42 U.S.C. § 1395w-23(b)(2); *see also* 42 C.F.R. 422.164(c).

CMS then proposes and finalizes any new measures through notice-and-comment rulemaking. 42 C.F.R. § 422.164(c).

The detailed technical specifications for each measure each year appear in the annual Technical Notes, which are circulated to plans and displayed on CMS's website, but are not implemented through notice-and-comment rulemaking. *See* CMS, *Medicare 2026 Part C & D Star Ratings Technical Notes*, https://perma.cc/QP9G-E7X9 (Technical Notes). At a high level, the Technical Notes describe in detail how CMS will convert raw data about a contract's performance into measure-level ratings and, ultimately, into each contract's final Star Rating. *See* Technical Notes, 29-107 (describing detailed measure specifications and listing case-mix coefficients).

In 2010, Congress required CMS to begin using the Star Ratings system to provide additional payments to plans. *See* 42 U.S.C. § 1395w-23(o)(4)(A). Under that scheme, contracts with higher Star Ratings are entitled to receive two kinds of adjustment to the capitated per-beneficiary payment. Plans with higher Star Ratings receive a higher share of their rebate, which they must use to cover additional health care benefits that are not benefits under original Medicare, reduce cost-sharing, or reduce plan

premiums for beneficiaries. 42 U.S.C. § 1395w-24(b)(1)(C); 42 C.F.R. §§ 422.260, 422.266. MAOs that receive sufficiently high Star Ratings also receive an increase in their benchmark for the following year's bid. *See* 42 U.S.C. § 1395w-23(o)(1). Collectively, the increased benchmark and increased rebates available to plans with higher Star Ratings are referred to as "quality bonus payments." Each year in late May or early June, MAOs submit bids to CMS describing the plans they propose to offer to beneficiaries in the following year. These bids include a detailed description of how each contract will allocate any quality bonus payments—MAOs must inform CMS in advance what (if any) additional health care benefits they will offer, how (if at all) they will use quality bonus payments to reduce cost-sharing, and how (if at all) quality bonus payments will flow to reduced plan premiums.

**B. Factual Background**

In October 2025, CMS determined plaintiff's 2026 Star Rating to be 3.5 Stars. Plaintiff, a New Jersey-based company, then sued in the Southern District of Georgia, Brunswick Division, arguing that 20 of the 42 measures used to calculate its 2026 Star Ratings were unlawful. *See* Dkt. No. 1, at 13, ¶ 36. As relevant here, plaintiff first claimed that all 20 challenged

measures were invalid because the technical specifications describing how CMS calculates a contract's score on each measure were not adopted "by regulation" in violation of 42 U.S.C. § 1395hh(a)(2). *Id.* CMS has never promulgated by regulation detailed specifications describing how it converts raw data into measure scores for any of the 42 measures it used for the 2026 Star Ratings. Yet, plaintiff sought invalidation of only 20 measures on this ground—specifically, those on which it received 1, 2, or 3 stars.

Plaintiff further claimed that 10 of the challenged measures also violate a separate statutory requirement describing what data the Star Ratings may be "based on," *see* 42 U.S.C. § 1395w-23(o)(4)(A). In addition to the 10 that plaintiff challenged, 8 other measures also relied on data other than Quality Improvement Plan data. Plaintiff did not seek to invalidate those other measures on which it received 4 or 5 stars.

### C. Prior Proceedings

1. Defendants moved to dismiss for improper venue. Dkt. No. 21. Plaintiff claimed venue solely under 28 U.S.C. § 1391(e)(1)(B), which requires that "a substantial part of the events or omissions giving rise to [their] claim[s] occurred" in the Southern District of Georgia. CMS argued

that, because plaintiff's APA claims focused on CMS's centralized decisions to use certain measures, technical specifications, and data in the 2026 Star Ratings, and its subsequent calculation of the 2026 Star Ratings based on those decisions, no relevant "events or omissions" giving rise to plaintiff's claims took place in Georgia, let alone a "substantial part." The district court denied CMS's motion. Dkt. No. 40. The court concluded that (1) the collection of data about beneficiaries within the district, which was then factored into the challenged measures, and (2) the subsequent availability of the 2026 Star Ratings within the district, taken together, amounted to a "substantial part" of the acts or omissions giving rise to plaintiff's claims. *Id.* at 15-35.[1]

2. The parties cross-moved for summary judgment. On May 27, 2026, the district court granted summary judgment to plaintiff on the two grounds identified above. Dkt. No. 61. The court held that CMS must promulgate by regulation its "specifications for determining Star Ratings measures, including the specifications which appear in CMS's annual

[1] The district court then considered *sua sponte* whether to nevertheless voluntarily transfer the case to Washington, DC, which plaintiff conceded would have been a proper venue for their suit. The court decided that transfer was not warranted. Dkt. No. 59.

Technical Notes." *Id.* at 61. The court looked to 42 U.S.C. § 1395hh(a)(2), which requires that any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services," or individuals' eligibility "to furnish or receive services or benefits" under Medicare be adopted "by regulation." *Id.* at 60-62. The court concluded that all elements were satisfied here. In particular, the court concluded the measure specifications "govern[]" "the payment for services" because they define how Star Ratings will be calculated, which in turn affects MAOs' rights to receive quality bonus payments from CMS. *Id.* at 62-70. Because CMS did not implement the technical specifications for the challenged measures "by regulation," the court concluded that CMS could not rely on those measures in calculating plaintiff's 2026 Star Rating.

The district court also agreed with plaintiff about the kinds of data that CMS can consider in calculating Star Ratings. Here, the court focused on 42 U.S.C. § 1395w-23(o)(4)(A), which provides that "[t]he quality rating for a plan shall be determined according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)." The cross-referenced section refers to data collected pursuant to plans' "quality

improvement program[s]," under which "each [MAO] shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." 42 U.S.C. § 1395w-22(e)(3)(A)(i).

There was no dispute that some Star Ratings measures rely on data other than that collected pursuant to the quality improvement program. So, the key question was whether the statute's instruction to calculate Star Ratings "based on the data collected" under that program means "based *exclusively* on" that data. The district court concluded that it does. The court reasoned that "based on" can carry "multiple different meanings" depending on context. Dkt. No. 61, at 26. The court discounted neighboring provisions that make explicit when Congress meant for CMS to act based exclusively on certain information, concluding that there were distinct reasons why Congress needed to be explicit in those provisions. *Id.* at 28-33. The court found more instructive other distant provisions in the Medicare statute that expressly give CMS discretion to make decisions "based on" whatever criteria or factors that the Secretary deems appropriate. *Id.* at 33-34. Those provisions, the court concluded, indicate that Congress makes explicit when it intends to give CMS authority to

consider factors other than those expressly listed. *Id.* at 34-35. For those reasons, the court concluded that § 1395w-23(o)(4)(A) is best read to mean that CMS may only base its quality ratings on measures that use specific data collected under § 1395w-22(e). The court therefore invalidated 10 of the measures that relied on other data.

3. The district court's original opinion declined to consider the government's reply brief, erroneously stating that it was filed late. The government filed a motion for reconsideration. Dkt. No. 62. The following day, the district court issued an order granting in part and denying in part the government's motion; it stated that it reviewed the government's reply brief but declined to alter its decision on the merits. Dkt. No. 64.

### D. Standard of Review

Determinations about whether a venue is proper are legal decisions reviewed de novo, with any underlying factual findings reviewed for clear error. *See United States v. Muench*, 153 F.3d 1298, 1300 (11th Cir. 1998); 14D *Wright & Miller's Federal Practice & Procedure* § 3801 (4th ed.) (collecting cases). A district court order granting summary judgment is reviewed de novo. *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011).

This Court reviews "a district court's injunctive relief for abuse of discretion." *Pottinger v. City of Miami*, 40 F.3d 1155, 1157 (11th Cir. 1994).

**SUMMARY OF ARGUMENT**

I. The district court erred at the outset when it denied defendants' motion to dismiss for improper venue. The sole basis plaintiff claimed for venue in the Southern District of Georgia was that "a substantial part of the events or omissions giving rise to the claim occurred" in the district. 28 U.S.C. § 1391(e)(1)(B). Under binding circuit precedent, none of the relevant "events or omissions" that gave rise to plaintiff's APA claims occurred in the district. Plaintiff challenges decisions and actions taken by federal agency defendants, all of which occurred at the relevant agency headquarters.

The district court identified two in-district activities—(1) the collection of data about some of plaintiff's customers within the district, which then eventually fed into and formed some small part of defendants' calculation of plaintiff's Star Rating, and (2) the eventual publication of that Star Rating on an online platform accessible from everywhere in the country, including in the district. Those actives did not give rise to plaintiff's claims, nor were those activities independently wrongful in any

way. The court was therefore wrong to consider them at all. But even if those activities formed some part of the events giving rise to plaintiff's claims, plaintiff fell far short of carrying its burden to establish those activities formed a substantial part of the relevant events.

Venue was plainly improper in the Southern District of Georgia. This Court should vacate the district court's summary judgment order on that basis alone and remand with instructions to dismiss or transfer this case to a proper venue.

II. The district court further erred on in granting plaintiff summary judgment. The court's analysis of 42 U.S.C. § 1395hh(a)(2) turned on the assumption that payments CMS makes to MAOs in exchange for providing insurance benefits to Medicare beneficiaries are "payments for services" because MAOs provide a "benefit service." That assumption was wrong. As used throughout the Medicare Act, "services" refers to medical services provided by hospitals and other care providers. "Services" are distinct from "benefits," which generally refer to insurance coverage, *i.e.*, an eligible individual's entitlement to have payment made on his or her behalf by the government or an MAO.

Star Ratings have nothing to do with the amounts healthcare providers are paid for Medicare-covered services. And while Star Ratings can affect the quality bonus payments that MAOs receive in exchange for providing benefits to beneficiaries under the Medicare Advantage program, those payments are, by definition, not payments for services.

III. The district court also erred in concluding that § 1395w-23(o)(4)(A)'s requirement that CMS calculate Star Ratings "based on the data collected under section 1395w-22(e) of this title" means that CMS must calculate ratings "based exclusively on" those data. Precedent from this Court and the Supreme Court makes clear that the ordinary meaning of "based on" does not connote exclusivity.

That ordinary understanding is only confirmed by the context in which the phrase is used here and by the purposes of the Star Ratings system generally. In concluding otherwise, the district court disregarded binding precedent, disregarded or explained away other nearby provisions expressly directing CMS to take action "based only on" or "based entirely on" certain factors, and then relied on distant, dissimilar provisions of the Medicare statute to conclude that "based on" as used throughout the

Medicare statute must always connote exclusivity. The court erred at every step of that analysis.

IV. Finally, the district court abused its discretion by ordering defendants to recalculate plaintiff's Star Rating based on an artificial, cherrypicked list of measures that bears no relationship to the statutory defects the court identified. Under basic principles of equity and the APA's harmless error standard, plaintiff was not entitled to an order that invalidated and set aside only the particular measures that plaintiff scored poorly on while allowing plaintiff to retain the benefit of other measures it scored well on but that were equally infirm under the arguments the court accepted.

## ARGUMENT

### I. Venue Is Improper in the Southern District of Georgia.

Venue is "[t]he proper or a possible place for a lawsuit to proceed, [usually] because the place has some connection either with the events that gave rise to the lawsuit or with the plaintiff or defendant." *Venue*, Black's Law Dictionary (12th ed. 2024). By statute, venue in federal district courts is strictly limited. In actions against the United States, venue is governed by 28 U.S.C. § 1391(e). That provision provides that venue is proper in any

district where (A) a defendant resides; (B) "a substantial part of the events or omissions giving rise to the claim occurred"; or (C) the plaintiff resides. 28 U.S.C. § 1391(e)(1). Clover Insurance Company—the sole plaintiff—is a New Jersey company incorporated in New Jersey and with its principal place of business also in New Jersey. *See* Dkt. No. 1, at 16, ¶ 44. Defendants are all federal agencies and officers (HHS, CMS, HHS Secretary Kennedy, and CMS Administrator Oz) based in the Washington, DC, area. *See id.* ¶¶ 45, 47.[2] Thus, the sole basis for venue asserted here is that a "substantial part" of the relevant "events or omissions" occurred in the Southern District of Georgia under § 1391(e)(1)(B). *See id.* at 17, ¶ 51.

Under this Circuit's precedent, plaintiff bears the burden of establishing venue is proper. *Home Ins. Co. v. Thomas Indus., Inc.*, 896 F.2d 1352, 1355 (11th Cir. 1990); *see Tobien v. Nationwide Gen. Ins. Co.*, 133 F.4th 613, 619 (6th Cir. 2025) (describing the "correct" "majority" view as "when a defendant challenges the venue, the plaintiff bears the burden of proving venue by a preponderance of the evidence"). Because "restrictive venue

---

[2] HHS headquarters are located in Washington, DC, and CMS headquarters are located in Baltimore, MD. Plaintiff did not dispute that Washington, DC, would be a proper venue for this action. *See* Dkt. No. 22, at 17.

provision[s]" like those contained in § 1391(e) are "enacted for the benefit of defendants," the requirements of the venue statute must be strictly construed in favor of the defendant. *United States ex rel. Harvey Gulf Int'l Marine, Inc. v. Maryland Cas. Co.*, 573 F.2d 245, 248 (5th Cir. 1978);[3] *see Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 63 n.7 (2013) ("the purpose of statutorily specified venue" is usually "to protect the defendant against the risk that a plaintiff will select an unfair or inconvenient place of trial" (quoting *Leroy v. Great W. United Corp.,* 443 U.S. 173, 183-84 (1979))); *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) ("We are required to construe the venue statute strictly.").

Applying those standards to 28 U.S.C. § 1391, this Court has explained that the "events or omissions" test is a restrictive one. It focuses only "on relevant activities of the defendant, not of the plaintiff." *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371-72 (11th Cir. 2003) (quotation marks omitted).[4] Only "events that directly give rise to a claim are relevant"—*i.e.*,

[3] Decisions of the Fifth Circuit handed down before September 30, 1981, are binding precedent in this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[4] Although *Jenkins* interpreted an earlier version of § 1391's general venue provision, rather than the current version of the United States-

*Continued on next page.*

"only those acts and omissions that have a close nexus to the wrong" identified as a basis for the plaintiff's claims. *Id.* And even then, venue is only proper in "locations hosting a 'substantial part' of the events." *Id.* at 1371.

Plaintiff fell far short of establishing that the Southern District of Georgia is a proper venue for this action, and the district court erred at the outset by denying defendants' motion to dismiss.

### A. The Acts or Omissions that Gave Rise to Plaintiff's Claims All Took Place in or Near Washington, DC.

Under this Court's precedent, the first step in assessing venue under the "events or omissions" standard is to determine "[w]hat acts or omissions by [defendants] 'gave rise' to [plaintiff's] claim." *Jenkins*, 321 F.3d at 1372. Here, the events that gave rise to plaintiff's claim occurred exclusively in defendants' headquarters in the Washington, DC area.

---

specific provision, the language used in the provisions is identical. *Compare Jenkins*, 321 F.3d at 1371 (statute providing venue proper in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred"), *with* 28 U.S.C. § 1391(e)(1)(B) (venue proper "in any judicial district in which … a substantial part of the events or omissions giving rise to the claim occurred").

The gravamen of all of plaintiff's claims is that the selection by CMS of measures for the 2026 Star Ratings cycle was substantively or procedurally improper. *See, e.g.*, Dkt. No. 1, at 58-60, ¶¶ 233-234, 240-241 (defendants violated APA because 2026 Star Ratings measures relied on data not authorized by statute), *id.* at 61-62, ¶¶ 247-250, 254-256 (defendants violated APA by failing to adopt challenged measures by regulation).

Decisions about what measures defendants would use for the 2026 Star Ratings cycle, how defendants would calculate those measures, what steps to take before announcing those details, and what data to incorporate into the measures were all made at defendants' headquarters. CMS determined via APA notice-and-comment rulemaking and the Advance Notice process what measures it would include in the 2026 Star Ratings well in advance of their October 2025 publication. These decisions were made at defendants' headquarters and are summarized in the Advance Notice issued in January 2025. *See* CMS, *Advance Notice of Methodological Changes for Calendar Year (CY) 2026 for Medicare Advantage (MA) Capitation Rates and Part C and Part D Payment Policies* at 111-114 (Jan. 10, 2025), https://perma.cc/KWB8-VLWK. Similarly, defendants drafted and

promulgated from their DC-area headquarters the Technical Notes describing the mathematical specifications of how they would convert raw data into measure scores. 2026 Technical Notes.

By the time CMS released its Technical Notes, plaintiff had everything it needed to make its APA claims. It was clear even before Defendants published their summary in January 2025 which measures defendants would include in the 2026 Star Ratings. And when Defendants published the Technical Notes in October 2025—as they had every year for more than a decade—plaintiff knew that the minutiae of how Star Ratings are calculated would not be promulgated "by regulation." In other words, every "act[] or omission[]" "giving rise" to plaintiff's claims had already occurred. *Jenkins*, 321 F.3d at 1372. And all of those acts took place where the relevant agency decision-making occurred—at CMS and HHS headquarters.

That conclusion is consistent with Supreme Court precedent. In *Leroy*, 443 U.S. 173, the Court considered a constitutional challenge to an Idaho state statute, arguing that the Idaho statute was preempted by federal law as applied to the plaintiff's conduct. In concluding that venue over that claim was not available in Texas, the Court did not dispute that

the plaintiff would feel the "impact" of Idaho's statute in Texas. *Id.* at 186. The Court nevertheless found that the plaintiff's claims challenging the legality of the Idaho law had "only one obvious locus—the District of Idaho." *Id.* at 185. That was because it was action "taken in Idaho by Idaho residents—the enactment of the statute by the legislature" and enforcement of the statute by Idaho officials—"that provide[d] the basis for" the plaintiff's claim. *Id.* at 185-86.[5]

---

[5] While *Leroy* was decided under an earlier version of the venue statute, which allowed venue only in "the judicial district … in which the claim arose," the Court in *Leroy* assumed (without deciding) that a claim could arise in more than one district. 443 U.S. at 184-85 & n.19. As other circuits have observed, because *Leroy* focused on the "actions" giving rise to the plaintiff's claims and assumed more than one district could be a proper venue, the decision "still retains viability" in understanding the modern venue statute. *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994); *see Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 867 (2d. Cir. 1992) (while some factors discussed in *Leroy* about distinguishing between two or more plausible venues are no longer relevant, "[a]part from this point, … *Leroy* and other precedents remain important sources of guidance"). That is because the 1990 amendment potentially expanded the number of districts in which venue could be found proper, but it did not substantively modify the nexus required between the claim and the judicial district. In particular, the amended language did not suggest that venue could be premised on the plaintiff's own contacts with the forum district. To the contrary, the amended language ("events or omissions giving rise to the claim") made *more explicit* what the *Leroy* Court had already found to be implicit in the pre-amendment version—*i.e.*, that the venue inquiry should ordinarily focus on the allegedly wrongful conduct of the defendant. The

*Continued on next page.*

Just as a challenge to the enactment of a state statute "obvious[ly]" arises wherever the state legislature enacted and applies the statute, a challenge to the legality of agency decision making under the APA just as "obvious[ly]" arises where the agency developed, drafted, implemented, and applied the underlying agency action. Lower courts have recognized as much. When a plaintiff brings APA claims against a federal agency, district courts consistently focus on where the challenged agency decision-making process occurred to determine what acts or omissions gave rise to the claims. *See, e.g.*, *Awad v. Mayorkas*, 2022 WL 1215521, at *2 (M.D. Fla. Apr. 7, 2022), *report and recommendation adopted*, 2022 WL 1212803 (M.D. Fla. Apr. 25, 2022); *Wolfram Alpha LLC v. Cuccinelli*, 490 F. Supp. 3d 324, 330 (D.D.C. 2020); *Ngonga v. Sessions*, 318 F. Supp. 3d 270, 275 (D.D.C. 2018); *see also Rogers v. Civil Air Patrol*, 129 F. Supp. 2d 1334, 1339 (M.D. Ala. 2001) ("challenge to federal legislation" arose in DC because the statute was "drafted by Congress and signed by the President" there.); *Seariver Mar. Fin. Holdings, Inc. v. Pena,* 952 F. Supp. 455, 462 (S.D. Tex. 1996) (DC was an

---

1990 amendment therefore casts no doubt on the continuing vitality of the Court's reasoning and holding in *Leroy.*

"obvious" venue in light of the plaintiffs' challenge to the constitutionality of federal legislation).

### B. The In-District Acts Identified by the District Court Did Not "Give Rise" to Any Claim.

The district court nevertheless found that venue was proper in the Southern District of Georgia based on two supposed "acts or omissions" that defendants took within the district: (1) defendants collected data about plaintiff's customers in the district (and later used that data elsewhere); and (2) defendants subsequently published plaintiff's Star Rating on an online portal that is accessible from everywhere in the country, including within the district.

1. Neither the collection of data from plaintiff's customers nor the eventual publication of plaintiff's Star Rating "gave rise" to plaintiff's APA claims. It is not enough that an activity is related to the case or even a "necessary event, in a causal sense," to the underlying claim. *Jenkins*, 321 F.3d 1372. The focus must be on acts or omissions that "have a close nexus to the wrong" that actually gives rise to the claim. *Id.* Under that standard, neither of the contacts the district court identified should have been considered in the venue analysis at all. Plaintiff raises APA challenges to

CMS's decision to apply various metrics to it, claiming that those decisions were unlawful *ab initio* because they conflict with various statutory requirements. As noted, those decisions—about what the relevant statutes allow, whether notice-and-comment was required, and what data and metrics should feed into the 2026 Star Ratings—all took place in or near DC. *See supra* pp. 21-26.

2. The collection of data about beneficiaries was, in some sense, a prerequisite for CMS's eventual *calculation* of plaintiff's Star Rating, but that data collection does not have a "close nexus to the wrong" plaintiff alleges for numerous reasons. This Court's decision in *Jenkins* is instructive. There, this Court expressly "approve[d]" the "analytical framework" of an Eighth Circuit decision rejecting a plaintiff's attempt to bring a trademark infringement claim in the district where the infringing products were manufactured. *Jenkins*, 321 F.3d at 1371-72. The Eighth Circuit had concluded that the manufacturing of the infringing products was not an "event giving rise to [the plaintiff's] claim because it was not itself wrongful." *Id.* at 1372 (quoting *Woodke v. Dahm*, 70 F.3d 983, 985-86 (8th Cir. 1995)). It was the defendant's separate actions "passing off" those products under a registered trademark that was the wrong giving rise to

the plaintiff's claims. *Id.* at 1371. The fact that the manufacturing of the products was "a necessary event, in a causal sense, to an attempt to pass them off" under the registered trademark was not enough because the statute requires a "close nexus" between the in-district acts and the wrong alleged. *Id.* at 1372.

Applying that same framework here, the in-district data gathering the district court identified was not an act or omission that gave rise to any of plaintiff's claims. The data gathering that took place within the district is exactly like the manufacturing of the infringing products this Court discussed in *Jenkins*: Defendants' gathering of information about plaintiff's customers—including whatever percentage of those customers live within the district—"was a necessary event, in a causal sense," to defendants' subsequent calculation of plaintiff's Star Rating. *Jenkins*, 321 F.3d at 1371-72. But the data gathering was "not itself wrongful" in any way. *Id.* at 1372. None of plaintiff's claims suggest that CMS is prohibited from gathering data about Medicare Advantage beneficiaries. To the contrary, multiple provisions in the Medicare statute authorize the Secretary to collect and disseminate information, including comparative information,

about plans offering insurance. *See* 42 U.S.C. §§ 1395w-21(d)(1), (4)(D); 1395w-101(c)(1).

The only alleged wrong conceivably related to the data CMS gathered was CMS's decision to use that data in calculating plaintiff's 2026 Star Ratings in the first place; as already explained those decisions were made at CMS headquarters, not in Georgia. But even if the calculation of plaintiff's 2026 Star Rating was itself a wrongful act or omission that gave rise to plaintiff's claims, plaintiff's 2026 Star Rating was also calculated by defendants at their headquarters in the DC-area, not in Georgia. Thus, the district court's venue decision cannot be properly based on those actions.

3. The second in-district activity that the district court relied on—the fact that the Start Ratings were ultimately accessible in the district on the internet—is even further afield. First, the *publication* of the Star Rating forms no part of the wrong underlying plaintiff's claims—there is no dispute that CMS was required to make the ultimate Star Rating available to the public. Plaintiff challenges, at most, the *calculation* of that figure. Second, this Court has made clear that venue cannot turn on where plaintiffs experience the effects of the alleged wrong. *See Jenkins*, 321 F.3d at 1371-72 (venue "focus[es] on relevant activities of the defendant, not of

the plaintiff"); *Woodke*, 70 F.3d at 985 (rejecting an argument that venue is appropriate in district where the plaintiff would feel "ultimate effect"). Whatever harms plaintiff claims from potential customers eventually viewing the Star Ratings online, those are not actions "of the defendant" "that directly give rise to [any] claim" plaintiff asserted in its complaint. *Jenkins*, 321 F.3d at 1371-72.

4. Finally, the district court's conclusion that relevant "events or omissions giving rise to" plaintiff's claim took place in the district leads to absurd results. Under the court's theory, venue would be proper for any challenge to CMS's Star Ratings methodologies in any district in the country where a company has customers or even potential customers. Millions of Americans rely on Medicare, and Medicare beneficiaries—about whom CMS collects various data, and who are able to access Star Ratings via the online portal—live in every district in the country. "[I]t is absolutely clear that Congress did not intend" via the limited venue provisions to give plaintiffs "an unfettered choice among a host of different districts." *Leroy*, 443 U.S. at 185; *see also Tobien*, 133 F.4th at 622 ("Congress did not intend to allow plaintiffs to manipulate the venue rules in that way.").

### C. The In-District Acts Are Not a Substantial Part of the Relevant Events.

Even assuming the district court was correct to consider the alleged in-district actions as part of "the events or omissions giving rise to [plaintiff's] claim[s]," those actions do not form a "substantial part" of the relevant events. The "substantiality" requirement is a meaningful one. "Substantial" does not necessarily mean "most," and it can be possible for more than one district to be a proper venue under 28 U.S.C. § 1391(e)(1)(B). But it is not sufficient for a plaintiff to demonstrate that some small portion of the events "giving rise to [their] claim[s]" occurred in the district. *See Gulf Ins.,* 417 F.3d at 357 (courts should "take seriously the adjective 'substantial'"); *Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d 291, 294 (3d Cir. 1994); *see also Jenkins*, 321 F.3d at 1372 (explaining that a "minimum contacts"-style analysis is not a "proper venue analysis"). Plaintiff fell far short of carrying its burden to demonstrate that a substantial portion of the events giving rise to their claims occurred in the Southern District of Georgia.

First, even if the gathering of data from plaintiff's members and the eventual publication of the Star Ratings online formed some a part of the

events or omissions giving rise to plaintiff's claims, those actions do not form a substantial part—either qualitatively or quantitatively—of the events giving rise to their claims. For all of the reasons given above, the core actions of defendants giving rise to plaintiff's claims occurred in DC. *See supra* pp. 21-26.

Second, and in any event, even if the gathering of data about plaintiff's members and subsequent online publication of the ratings *as a whole* formed a substantial part of the relevant acts, plaintiff failed to establish that the data gathering and publication that took place within the district was itself sufficiently substantial.

The fact that some percentage of plaintiff's beneficiaries reside in the district does not demonstrate that even a "substantial part" of the data that fed into their Star Ratings was collected in the district. Plaintiff's problem is one of fractions, or really fractions of fractions. Suppose plaintiff could show that the gathering of data about all of its members formed half of the total acts giving rise to its claim. Suppose further that plaintiff could show

that 10% of its total plan membership lived in the district.[6] Even under those very favorable assumptions, plaintiff would have only demonstrated that one-tenth of one-half—*i.e.*, 5%—of the relevant events—took place within the district. Under any reasonable construction of the word "substantial," that showing would not satisfy the statute's requirement. Circuit precedent reflects that "[t]he ordinary dictionary meaning of 'substantial' is: Considerable, in amount, value or the like; large," or "of ample or considerable amount, quantity or dimension." *Commissioner v. Kelley*, 293 F.2d 904, 914 (5th Cir. 1961); *see also Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 146 (2017) ("'Substantial,' as it is commonly understood, may refer either to qualitative importance or to quantitatively large size.").

But plaintiff made nothing close to even that hypothetical (insufficient) showing. And here, the fact that *plaintiff* bore the burden of establishing proper venue is fatal. In its briefing on the motion to dismiss, plaintiff declined to provide actual numbers that would allow the district

[6] Even if this assumption is valid, plaintiff has not shown that all the data gathered about its members was actually gathered from the district via, for example, surveys sent to members. CMS uses some data from third parties like the Independent Review Entity that do not, so far as plaintiff alleges, operate in the Southern District of Georgia at all.

court to assess the proportion of its members that resided in the district. Plaintiff alleged only that it provides Medicare Advantage plans to "thousands" of members in the Southern District of Georgia, and that Georgia *as a whole* is its *second* biggest market by membership. Dkt. No. 1, at 17, ¶ 51, Dkt. No. 22-1, at 3-4, ¶¶ 6, 11. But that says nothing about what percentage of plaintiff's total beneficiaries reside in Georgia as a whole, let alone the Southern District in particular. Indeed, Georgia has three judicial districts, with the *Northern* District containing the four most populous counties.

In later declarations submitted during briefing about whether to transfer the case to another proper venue, plaintiff provided slightly more color, but in doing so only undercut its case. Plaintiff there said that it provides coverage to "thousands of members within" the district, to "many thousands of additional members spread across Georgia," and, "[a]ll told," "to over 100,000 beneficiaries" nationwide. Dkt. No. 42-6, at 2 ¶ 6. Whatever can be gleaned from these vague characterizations is unhelpful for plaintiff. Presumably "thousands" is meant to convey a materially smaller number than "many thousands," and there is no indication that even the "many thousands" of beneficiaries living in the rest of Georgia

would constitute a substantial portion of the "over 100,000" beneficiaries scattered across the country. Plaintiff's deliberate ambiguity precludes a venue ruling in its favor.

The same is true for the eventual publication of the Star Ratings: Even if defendants' publication of the Star Ratings on the internet formed some part of the events giving rise to plaintiff's claim, plaintiff fell far short of demonstrating that the number of customers (or potential customers) living in the Southern District of Georgia was sufficiently substantial—either in an absolute sense or relative to plaintiff's nationwide customer pool—to make venue appropriate. The district court's contrary conclusion would render every district in which plaintiff has any number of beneficiaries (or even potential beneficiaries) a proper venue. That conclusion is inconsistent with Congress's use of the word "substantial," and with the general rule that venue statutes should be construed strictly. *See Gulf Ins. Co.*, 417 F.3d at 357 (courts should "take seriously the adjective 'substantial'"); *Cottman Transmission Sys.*, 36 F.3d at 294 ("Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute.").

* * *

Because venue was improper, the district court erred at the outset when it denied defendants' motion to dismiss. It should never have reached the merits of plaintiff's claims, and its subsequent decision granting summary judgment in plaintiff's favor must be vacated and remanded with instructions to dismiss or transfer the case to a proper venue. *See* 28 U.S.C. § 1406(a).

## II. Star Ratings Measures Do Not Trigger § 1395hh(a)(2)'s Notice and Comment Requirement.

### A. Star Ratings Have No Effect on "Payment[s] for Services."

Section 1395hh(a)(2) requires CMS to engage act "by regulation" whenever it imposes (1) a "rule, requirement, or other statement of policy" (2) that "establishes or changes a substantive legal standard" (3) "governing" "the scope of benefits, the payment for services, or the eligibility" of an individual or entity "to furnish or receive services or benefits." 42 U.S.C. § 1395hh(a)(2). The district court concluded that CMS actions establishing the detailed technical minutiae of how CMS turns raw data into measure-level measures governing Star Ratings trigger that requirement because they are a "statement of policy" that "govern[s]" "the payment for services" under the Medicare Advantage program. But the

text and structure of the Medicare statute foreclose the conclusion that "payment for services" encompasses payments the government makes to MAOs for providing insurance coverage.

1. "Payment for services" as used in the Medicare statute refers to the amounts paid to the providers or suppliers of medical services in exchange for furnishing medical care to beneficiaries. The statutory text makes that clear. The Medicare statute defines various types of "services" in its general definitions provision, and those definitions uniformly use "services" to refer to medical services provided by a hospital or other medical care provider or supplier. *See, e.g.*, 42 U.S.C. § 1395k(a)(2) (referring to "home health services," "medical and other health services," "outpatient physical therapy services," and "facility services furnished in connection with surgical procedures,"); *id.* § 1395x(a)(referring to access to "hospital services" or "extended care services"); *id.* § 1395x(b) (referring to "services furnished to an inpatient of a hospital"); *id.* § 1395x(k) (referring to "services furnished by" a hospital or nursing facility). Indeed, the statute defines a "provider of services" to mean "a hospital, critical access hospital, rural emergency hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, hospice program."

*Id.* § 1395x(u). And the statute defines "supplier" as "a physician or other practitioner, a facility, or other entity (other than a provider of services) that furnishes items or services under this title." *Id.* § 1395x(d). Not included in either list is an insurance company or any other entity that pays others to provide services. That same understanding is reflected throughout the Medicare statute. *See, e.g.*, *id.* § 1395w-22(a)(1)(B). CMS regulations, too, have long defined "services" to refer exclusively to medical care. *See* 42 C.F.R. § 400.202 ("Services means medical care or services and items").

Similarly, courts (other than the district court here) have consistently understood that "payment for services" refers to the amounts Medicare pays healthcare providers in exchange for furnishing covered medical services to patients. *See, e.g.*, *Azar v. Allina Health Servs.*, 587 U.S. 566, 570 (2019) ("payment for services" covers payments "the federal government has paid hospitals directly for providing covered patient care"); *Humana Inc. v. U.S. Dep't of Health & Hum. Servs.*, 806 F. Supp. 3d 642, 648 (N.D. Tex. 2025) ("payments for services refers to the amounts Medicare must pay providers for furnishing covered services").

Equally clear from the Medicare statute: "Services" are distinct from "benefits." In Medicare terminology, a benefit is the promise of coverage for the cost of medical services that is guaranteed to Medicare beneficiaries under the Medicare program. Congress frequently distinguishes between "services" and "benefits," including in § 1395hh(a)(2) itself, which draws clear distinctions between actions governing "payment for services" and "the scope of benefits." 42 U.S.C. § 1395hh(a)(2). Numerous other provisions similarly use both terms in a way that demonstrates they are distinct, mutually exclusive categories. *See id.* § 1395w-21(a)(1) (beneficiaries can receive benefits either through "fee-for-service program under parts A and B" or through Medicare Advantage). And the "scope of benefits" under Medicare in turn, refers to "entitlement to have payment made" for specified "services." *See id.* §§ 1395d, 1395k(a).

This distinction between "benefits"—referring to a guarantee by the insurer to cover certain medical expenses—and "services"—referring to the underlying medical procedures and services themselves—is well understood by the healthcare community, including insurers. *See* Juliette Cubanski et al., *Medicare 101*, KFF (Oct. 6, 2025), https://www.kff.org/medicare/health-policy-101-medicare/?entry=table-

of-contents-what-is-medicare; Humana, *Medicare Advantage vs. Original Medicare: Which Option Should I Choose?* (May 28, 2026), https://perma.cc/JYE5-T35D; Anthem, *What Is Medicare?* https://perma.cc/PXF2-B4ZV.

2. Payments from CMS to MAOs are payments to compensate MAOs for providing benefits, not services. Under Medicare Part C, MAOs provide insurance, not medical services. *See MSP Recovery Claims, Series LLC v. Metropolitan Gen. Ins. Co.*, 40 F.4th 1295, 1298 (11th Cir. 2022) (describing MAOs as "insurance companies"). The statute makes this clear: MAOs "provide … *benefits* under the original medicare fee-for-service program option"; they do not furnish medical "services" themselves. 42 U.S.C. § 1395w-22(a)(1)(A) (emphasis added). By agreeing to provide insurance coverage to beneficiaries, MAOs effectively agree to make payments to medical providers on behalf of beneficiaries when they obtain covered medical services. Star Ratings have no bearing on the payments that MAOs must make to healthcare providers when beneficiaries use covered services. By statute, all MAOs—regardless of Star Rating—are required to provide the same coverage that CMS would provide under original Medicare. 42 U.S.C. § 1395w-22(a)(1)(A) (MAOs

must offer "benefits under the original medicare fee-for-service program option."); *see also id.* § 1395w-22(a)(1)(B).

Nor is there any connection between Star Ratings and the fixed monthly payments MAOs receive from the government for providing that pre-defined level of coverage. In exchange for providing benefits to Medicare beneficiaries—essentially stepping into the shoes that CMS itself would otherwise fill—MAOs receive "monthly payments" from CMS. 42 U.S.C. § 1395w-23(a)(1)(A). Those flat, per-beneficiary payments are called a "capitation [fee]." *Id.* §§ 1395w-22(a)(5), 1395w-23. But the amount of those payments have nothing to do with Star Ratings, as evidenced by the fact that all participating MAOs receive it regardless of their Star Ratings.

Quality bonus payments, it is true, are linked to Star Ratings. But quality bonus payments have nothing to do with any "payment[s] for services" under Medicare. Those payments, like the monthly capitation fees, are made to MAOs in exchange for providing benefits, not services. The quality bonus payments unlocked by certain Star Ratings are flat, monthly amounts that do not turn on what medical services a beneficiary actually receives in a given month or how much the MAO pays for those services. 42 U.S.C. § 1395w-23(a)(1)(B)(i). As noted, a plan's obligation to

pay for services on behalf of beneficiaries exists whether or not it receives quality bonus payments. And the Medicare statute and regulations forbid MAOs from using quality bonus payments to pay for services. Plans may use quality bonus payments only to pay for supplemental benefits—like additional categories of care beyond what is ordinarily covered by Medicare—or reduce beneficiary premiums. 42 C.F.R. § 422.266(b).

3. The district court did not grapple with the distinct meanings of "services" and "benefits" and instead simply asserted that "the Medicare Act provides for payments for services flowing between multiple parties in multiple different directions, including payments *by CMS to plans*," characterizing the insurance coverage that MAOs provide as a "benefit service." Dkt. No. 61, at 66-67. As shown above, the Medicare statute distinguishes between "benefits" and "services," and the concept of a "benefit service" is incoherent. The court cited no relevant authority for its assertion that the quality bonus payments CMS makes to MAOs are themselves "payment for services" as that term is used in the Medicare statute. The court suggested that the "basic structure of the Medicare Advantage program" supports that view, *id.* at 67, citing this Court's general discussion of the Medicare Advantage program in *MSP Recovery*

*Claims*, 40 F.4th at 1298. But *MSP Recovery* only confirms the error described at length above: That decision contrasts traditional Medicare, a "fee-for-*service*" scheme under which CMS "pay[s] providers directly for [beneficiaries'] medical care," with Medicare Advantage, where a "private insurer of the enrollee's choice provides Medicare *benefits*." *Id.* (emphases added).

This Court should reject the district court's novel, incorrect understanding of "services" as used in the Medicare statute and vacate the district court's resulting conclusion that the technical details of how CMS calculates Star Rating measure scores must be adopted by regulation.

**B. Neither of the Alternative Arguments Plaintiff Pressed Below Withstand Scrutiny.**

Below, plaintiff raised two alternative theories for why CMS was required to act "by regulation" to describe the technical details for turning raw data into Star Ratings measure scores. The district court did not reach these alternative arguments, and for good reason.

1. Plaintiff argued that the measures and data that contribute to Star Ratings "govern[]" an MAO's "eligibility … to furnish … benefits" because regulations provide that CMS may terminate a plan if it receives a

Star Rating of less than three stars for three consecutive years. *See* 42 C.F.R. § 422.510(a)(4)(xi). As a district court in Texas correctly held in rejecting exactly this argument, plaintiff's position is incompatible with the ordinary meaning of the word "govern." To "'govern' means 'to prevail or have decisive influence; control.'" *Humana*, 806 F. Supp. 3d. at 648 (citing Merriam Webster); *see also Govern*, Black's Law Dictionary (12th ed. 2024) (defining "govern" as "to control a point in issue").

The technical specifications that CMS uses to calculate Star Ratings measures, which in turn affect MAO's entitlement to quality bonus payments each year, do not "have decisive influence" or "control" over an MAO's eligibility to furnish benefits. First, the decisions related to measure specifications and calculations do not govern the overall Star Rating that an MAO receives in a given year. Second, by the regulation's terms, the Star Rating calculation process in any given year does not govern whether CMS may terminate a plan: Only if a plan receives a rating of less than three stars for "3 consecutive contract years" does CMS have discretion to terminate a plan. 42 C.F.R. § 422.510(a)(4)(xi). And third, the regulation expressly allows, but does not require, CMS to terminate persistently low-performing plans. *See id.* § 422.510(a) (CMS "may" terminate a contract if it

meets any of the listed criteria). Both "[t]he discretionary component of the low-performing provision and indirect nature of the Star Ratings metrics mean they are too attenuated to qualify as 'governing' eligibility for Medicare Advantage programs." *Humana*, 806 F. Supp. 3d at 648.

2. Plaintiff also argued that Star Ratings "govern[]" "the scope of benefits" MAOs provide because (1) Star Ratings can entitle MAOs to quality bonus payments; and (2) MAOs can use quality bonus payments to, among other things, offer more supplemental benefits to beneficiaries. But again, that argument is incompatible with the ordinary meaning of "govern." As explained, to "govern" means "to have decisive influence" or "control." *Supra* pp. 43-44. But the availability (or unavailability) of quality bonus payments based on measure specifications does not "control" MAOs' ability to offer additional benefits.

The Medicare statute makes clear that MAOs can offer whatever supplemental benefits they want, regardless of the Star Ratings a contract receives, as long as the Secretary has approved those supplemental benefits (which he "shall" unless he determines that approving them would "substantially discourage enrollment"). 42 U.S.C. § 1395w-22(a)(3)(A). And CMS regulations make clear that MAOs that receive quality bonus

payments are not required to use those payments to offer supplemental benefits. 42 C.F.R. § 422.266(b) (quality bonus payments may be used to either provide supplemental health care benefits, offer rebates for prescription drug coverage, or offer rebates for Medicare Part B premiums). Thus, Star Ratings—let alone the technical specifications for calculating the individual measures that lead to a Star Rating—do not "govern[]" the scope of supplemental benefits that an MAO provides to beneficiaries.

## III. Section 1395w-23(o)(4)(A) Does Not Require CMS to Calculate Star Ratings Based Exclusively on Particular Data.

Section 1395w-23 provides that a plan's quality rating "shall be determined according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title)." 42 U.S.C. § 1395w-23(o)(4)(A). That cross-referenced section requires each MAO to have a "quality improvement program" and to "provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality" as part of that program. *Id.* § 1395w-22(e)(1), (3)(A)(i). Twenty-seven measures rely only on data collected via the systems that plans use to report quality improvement data. But CMS also

relies on other data that provide information about plan quality, like call center performance data, data about members who choose to leave a plan in any given year, and prescription drug data showing how well plans that offer a drug benefit perform on various metrics. The question is whether § 1395w-23's directive to calculate Star Ratings "based on" the quality improvement data means that CMS may consider only that quality improvement data. It does not.

1. When interpreting a statute, undefined terms are given "their plain and ordinary meaning 'because we assume that Congress uses words in a statute as they are commonly understood.'" *U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 976 (11th Cir. 2014) (quoting *Polycarpe v. E&S Landscaping Serv., Inc.*, 616 F.3d 1217, 1223 (11th Cir. 2010) (per curiam)). As the Supreme Court has explained, "[t]o 'base' means '[t]o make, form, or serve as a foundation for,' or '[t]o use (something) as the thing from which something else is developed.'" *Hughes v. United States*, 584 U.S. 675, 686 (2018) (quoting *Base*, Black's Law Dictionary 180 (10th ed. 2014)). And "a 'base' is '[t]he starting point or foundational part of something,' or '[a] point, part, line, or quantity from which a reckoning or conclusion proceeds.'" *Id.* Thus, "[a] district court

imposes a sentence that is 'based on' a Guidelines range if the range was a basis for the court's exercise of discretion in imposing a sentence." *Id.* But "a basis" is not the only input into a finished product. So, if, to continue the example, a district court takes into account other considerations, and imposes a sentence outside the Guidelines range, the Guidelines nevertheless remain "in a real sense the basis for the sentence." *Id*. In other words, the ordinary meaning of "based on" does not connote exclusivity.

Indeed, this Court has repeatedly recognized that the "plain and ordinary meaning" of "'based on' does not mean 'exclusively on' or 'solely on.'" *Advance Tr. & Life Escrow Servs., LTA v. Protective Life Ins. Co.*, 93 F.4th 1315, 1333 (11th Cir. 2024); *Slam Dunk I, LLC v. Connecticut Gen. Life Ins. Co.*, 853 F. App'x 451, 455 (11th Cir. 2021) (unpublished) ("Nothing about the plain and ordinary meaning of the phrase 'based on' connotes exclusivity, and nothing about it implies the list that follows is exhaustive."). Notably, this Court has rejected the view that the phrase "based on" is "'at least ambiguous'" on this score. *Advance Tr.*, 93 F.4th at 1332 (quoting *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 763 (8th Cir. 2020)). And it has observed that the phrase "based on" "is most naturally read" to mean "supported by" "in any part" and that reading the phrase to connote

exclusivity would effectively amend the phrase to "insert[] the word 'solely.'" *Cooper v. Blue Cross*, 19 F.3d 562, 567 (11th Cir. 1994) (per curiam); *see also, e.g.*, *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993) ("based upon" in the False Claims Act does not mean based "solely" upon because that word "is not included" in the relevant provision).

That binding precedent correctly reflects that common sense, everyday usage of the phrase "based on" does not connote exclusivity. *See United States v. Dawson*, 64 F.4th 1227, 1236 (11th Cir. 2023) (courts look to the "plain and ordinary meaning of the statutory language" in interpreting meaning). An instruction to calculate some figure "based on" some input is mandatory as to that specified data but does not ordinarily suggest exclusivity. For example, if a boss instructs an employee to "calculate projected annual returns based on the following assumptions about future gas prices," the employee would understand that instruction to require use of the given assumptions. But the employee would properly understand that she has discretion to decide what other information to incorporate in her calculation. And so long as she used the specified assumptions as part

of her calculation, she would naturally be able to represent that her final calculation was "based on" those assumptions.

Because precedent and common sense establish that the phrase "based on" "has a plain and unambiguous meaning" and produces a "coherent and consistent" outcome in the context of this particular provision, this Court should "go no further and confine [its] analysis to the plain language of the statute." *In re Kulakowski*, 735 F.3d 1296, 1300 (11th Cir. 2013).

2. The district court did not meaningfully engage with that precedent in its decision and instead concluded that "based on" is ambiguous and can sometimes mean "based exclusively on" depending on context. Dkt. No. 61, at 26-27. By failing to follow or distinguish directly relevant precedent, the court "transgressed the fundamental rule that courts of this circuit are bound by the precedent of this circuit." *In re Hubbard*, 803 F.3d 1298, 1309 (11th Cir. 2015).

The sole Eleventh Circuit case the district court cited in support of its conclusion that the ordinary meaning of "based on" is ambiguous is a criminal case where the court repeatedly referred to the jury's duty to issue a verdict "based on" the evidence and facts presented at trial as a

shorthand for "based exclusively on." Dkt. No. 61, at 26 (citing *United States v. Brown*, 996 F.3d 1171, 1184, 1194) (11th Cir. 2021) (en banc)). *Brown* does not support the district court's conclusion. Unlike in *Advance Trust* and *Cooper*, this Court in *Brown* had no occasion to consider the ordinary meaning of "based on" when deployed in legal text and was instead simply using the phrase in passing to describe the jury's well-understood duties in a criminal case. In any event, the jury instructions this Court considered in *Brown* are inconsistent with the district court's holding: The instruction this Court considered specified that the verdict "'must be based *only* on the evidence presented during the trial,'" a phrasing that—under the district court's interpretation—would be superfluous. *Brown*, 996 F.3d at 1176 (emphasis added).

3. Regardless, the district court's reasoning fails on its own terms. To the extent that the meaning of "based on" depends on surrounding context, the court erred in concluding that the context here supports plaintiff's argument. To the contrary, context only confirms the agency's understanding. Most glaringly, two provisions within the same statutory subsection use "based *only* on" or "based *entirely* on" to make clear that Congress intended exclusivity. *See* 42 U.S.C. § 1395w-23(c)(4)-(5) (emphasis

added). Those close-in-proximity uses of different phrasing indicate that, when Congress intends exclusivity, it says so. *See Cooper*, 19 F.3d at 567 ("inserting the word 'solely'" into the phrase "based on" would alter the meaning of the phrase). And this Court has made clear that, when Congress "uses different language in similar sections," it generally does so to convey "different meanings." *Iraola & CIA, SA v. Kimberly Clark Corp.*, 232 F.3d 854, 859 (11th Cir. 2000).

In addition, in several other neighboring sections of the Medicare statute "based on" cannot be read to connote exclusivity because doing so would render those provisions nonsensical. In § 1395w-28(f)(8)(D)(i)(I), the statute directs CMS to set standards "based on input from stakeholders." That must, of course, mean that stakeholder input must be considered as a part of formulating the standards, but not the exclusive ingredient. Similarly, § 1395w-22(b)(1) requires that MAOs must not "deny, limit, or condition the coverage or provision of benefits … based on any health status-related factor." That must mean that an MAO cannot deny or limit coverage relying on a health-related factor alone *or* in combination with other factors. *See Cooper*, 19 F.3d at 567.

4. Nor does the district court's reading make sense given the broader context, purpose, and history of the Star Rating system generally.

First, the district court focused on § 1395w-23(o)(4)(A) and its cross-reference to § 1395w-22(e), but those are not the only relevant provisions. Section 1395w-22(e) includes its *own* cross-reference, which reads: "Nothing in [this] subsection shall be construed as restricting the ability of the Secretary to carry out the duties under [42 U.S.C. §] 1395w-21(d)(4)(D)." 42 U.S.C. § 1395w-22(e)(3)(B)(iii). Those referenced "duties" are to "broadly disseminate information to medicare beneficiaries (and prospective medicare beneficiaries)," *id.* § 1395w-21(d)(1), including "[i]nformation comparing plan options," *id.* § 1395w-21(d)(4), on the basis of multiple "quality and performance indicators," *id.* § 1395w-21(d)(4)(D). That Congress emphasized that its limitation on data collection connected to plans' quality improvement programs did not restrict the Secretary's authority to engage in other data collection and dissemination activities is further evidence that § 1395w-22(e) cannot mean what the court concluded.

It is no accident that "broadly disseminat[ing] to" current and prospective beneficiaries "information comparing plan options" on "quality and performance indicators" bears a strong resemblance to one of

the "goals of the Star Ratings": helping "beneficiaries … make informed choices by being able to consider a plan's quality, cost, and coverage." 83 Fed. Reg. at 16,519. Indeed, the agency originally developed Star Ratings under its authority to implement § 1395w-21(d)'s requirement that "information about plan quality and performance indicators be provided to beneficiaries to help them make informed plan choices." *Id*. at 16520. And CMS has consistently explained that Star Ratings serve multiple purposes, including "to provide information to the beneficiary that is a true reflection of the plan's quality and encompasses multiple dimensions of high-quality care," focusing on "aspects of care and performance that are within the control of the health plan and can spur" better quality for beneficiaries. *Id.*

When Congress enacted the statutory provisions that require CMS to begin using the Star Ratings to provide additional payments to plans, it did so against that regulatory backdrop—including by specifically referencing "a 5-star rating system" for "quality ratings" that mirrored CMS's existing 5-star quality rating system. 83 Fed. Reg. at 16,520. Given the broad, information-sharing purposes of the Star Ratings program that CMS created, it makes little sense to read an (at best) ambiguous instruction to calculate those ratings "based on" certain information as somehow sub

silentio throttling CMS's ability to consider a range of relevant data sources. The more consistent understanding—which accords with the ordinary meaning of "based on" and harmonizes with § 1395w-22(e)'s own cross-reference to CMS's independent information-sharing obligations—is to understand the provision as requiring CMS to use quality improvement program data in its calculations, but leaving the agency free to incorporate other relevant data as well.

5. In concluding that context nevertheless suggested a meaning of "based on" different from its ordinary meaning, the district court relied on distant, dissimilar provisions of the Medicare statute. In doing so, the court erred several times over.

a. One of the provisions the district court relied on undermines—rather than supports—its conclusion. The court highlighted § 1395w-23(o)(4)(D)(ii), which provides that "the quality rating of the continuing contract is based *primarily* on" a particular measurement period. 42 U.S.C. § 1395w-23(o)(4)(D)(ii) (emphasis added). The court read the insertion of "primarily" to make "clear that the particular measurement period need not be the only information considered, as long as it is the quality rating's 'primary' basis." Dkt. No. 61, at 33. But that makes no sense. The addition

of the word "primarily" serves only to limit what would otherwise be meant by "based on"—it is an *additional* limitation on the agency's discretion that requires *more* than if the additional qualifier had been omitted. Just as the alternative phrases "based only on" or "based exclusively on" only make sense if "based on" alone would not connote exclusivity, the addition of the word "primarily" indicates that, while "based on" would normally connote only that the particular measure must be considered in some part, this provision requires that listed measure to be the main ingredient in the relevant calculation.

b. The district court also relied on various provisions throughout the Medicare statute that direct CMS to make decisions "based on" a list of specific factors, plus a catchall factor giving the agency authority to consider "such other factors as the Secretary determines to be appropriate." Dkt. No. 61, at 33-34; *see* 42 U.S.C. §§ 1395m(c)(2)(B)(i), 1395rr-1(e)(3)(B). The court reasoned that those catch-alls would not be necessary unless "based on" ordinarily connotes exclusivity. That reasoning suffers from several independent errors.

First, those provisions are structured differently from the provision at issue in ways that undermine their relevance to the ordinary meaning of

"based on" as used in § 1395w-23(o)(4)(A). The provisions the district court identified almost all deploy the common statutory tactic of providing a list of specific factors to be considered, followed by a final catch-all that uses broader terms. *See* 42 U.S.C. § 1395mm(a)(1)(B) (directing CMS to "define appropriate classes of members, based on age, disability status, and such other factors as the Secretary determines to be appropriate, so as to ensure actuarial equivalence"); *id.* § 1395rr-1(e)(3)(B) (giving CMS authority to issue emergency declarations "based on such medical conditions, diagnostic standards, and other criteria as the Secretary specifies"). As this Court has recognized, those kinds of lists trigger their own unique cannons of statutory interpretation. *SE Prop. Holding, LLC v. Welch*, 65 F.4th 1335, 1345 (11th Cir. 2023) (discussing "principle of statutory construction of ejusdem generis").

Section 1395w-23(o)(4)(A) is different. It features no list of factors, but instead contains a single, broad directive—that the "quality rating for a plan shall be determined according to a 5-star rating system." 42 U.S.C. § 1395w-23(o)(4)(A). That directive is then followed by a parenthetical providing that the rating shall be "(based on the data collected under section 1395w-22(e)of this title)." *Id.* None of the other provisions the

district court identified are similarly structured, so whatever relevant interpretive "context" they provide is limited at best.

Second, even assuming the district court was making apples-to-apples comparisons, the rule against superfluidity cannot bear the weight that the court placed on it. The "preference for avoiding surplusage constructions is not absolute." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004). Superfluidity in statutory construction often simply reflects an "ill-conceived but lamentably common belt-and-suspenders approach." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-77 (2012); *see In re Wild*, 994 F.3d 1244, 1268 n.22 (11th Cir. 2021) (citing Scalia and Garner for the proposition that "the surplusage canon must be applied 'with careful regard to context' and that 'a court may well prefer ordinary meaning to an unusual meaning that will avoid surplusage'").

c. Finally, it bears highlighting that the district court's entire approach to interpreting this provision was fundamentally misguided. To summarize the court's analysis: It (1) disregarded binding precedent about the ordinary meaning of "based on"; (2) disregarded or explained away other nearby provisions expressly directing CMS to take action "based only

on" or "based entirely on" certain factors; (3) failed to explain how its interpretation of the phrase "based on" comported with the broader purposes of the Star Ratings program; and then (4) relied on distant, dissimilar provisions in the (notoriously lengthy and complex) Medicare statute to conclude—invoking the rule against superfluidity—that "based on" as used throughout the statute must always connote exclusivity. As this Court recently observed, that approach to statutory interpretation is disfavored: Courts "'should not strain to find ambiguity' when clarity is on offer." *HM Fla.-ORL, LLC v. Governor of Fla.*, 2026 WL 2235960, at *9 (11th Cir. Aug. 4, 2026) (quoting *Sphinx Int'l, Inc. v. National Union Fire Ins. Co.*, 412 F.3d 1224, 1228 (11th Cir. 2005)). And courts cannot, "[i]n the face of clear language from the provision at issue and a clear inference from statutory context," "dig through" other provisions of a statute to "replace the text of the provision right in front of them." *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1321-22 (11th Cir. 2019). That admonition has special relevance in the context of a large, complex statute like the Medicare statute.

## IV. The Court Further Erred in Ordering CMS to Recalculate Plaintiff's Star Rating.

As detailed above, plaintiff's claims challenge decisions made by CMS about what measures, data, and formulas to use when calculating the 2026 Star Ratings. In particular, plaintiff claimed some of those decisions violated various general statutory requirements. The district court agreed with plaintiff's theories of statutory interpretation and concluded that CMS misunderstood the relevant statutory requirements when calculating the 2026 Star Ratings.

Yet, the relief plaintiff received ultimately bears little relationship to the errors the district court identified. Plaintiff's 2026 Star Rating was based on 42 measures. Plaintiff's notice-and-comment argument would mean that *all* 42 measures were invalidly applied, because CMS did not implement the technical specifications for any of those measures "by regulation." And the logic of plaintiff's argument that only data collected under § 1395w-22(e) may be used to calculate ratings would result in 18 measures being removed from consideration. Indeed, if all measures that relied on data that was not collected under § 1395w-22(e) were excluded, plaintiff's rating would have remained unchanged at 3.5 stars.

But rather than invalidating all measures infected by the supposed errors plaintiff identified, the district court allowed plaintiff to pick and choose which invalid measures would be used to calculate its 2026 Star Rating—cherry-picking 20 measures on which it did poorly to eliminate while leaving the measures on which it did better. Plaintiff nowhere alleged that the specific measures it challenges were uniquely infected by the errors it identified. The 22 measures the district court declined to disturb are those on which plaintiff received four or five stars. But under no conceivable understanding of the relevant statutory requirements would that precise configuration of 22 measures be permissible. Thus, the court issued an order requiring CMS to calculate an artificially inflated rating that has no relationship to plaintiff's real-world performance and no coherent basis in the statute. The court erred in issuing that order.

1. First, the relief granted runs afoul of basic rules of equity. Whenever a court issues injunctive relief, "traditional equitable principles" "presumpt[ively]" apply. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 347-48 (2024). And it is a basic rule of equity that, when a court conducts an equitable inquiry, it must act "on a case-by-case basis," considering all relevant facts and circumstances. *Holland v. Florida*, 560 U.S. 631, 649–50,

(2010). Here, the district court disregarded the disconnect between the nature of the wrong plaintiff claimed and the nature of the injunction it sought. The result was an order that bore no relationship to the legal errors the court concluded that defendants had committed. Rather than holding unlawful and providing plaintiff relief from the relevant agency decisions—*i.e.*, the decisions to apply the 2026 Star Rating measures without implementing the technical specifications "by regulation" and to incorporate into those measures data beyond those collected as part of MAOs' improvement plans—the court invalidated and set aside only the particular measures that plaintiff scored poorly on while allowing plaintiff to retain the benefit of other measures that were equally infirm under its logic.

Further, "[c]ourts of equity can no more disregard statutory … requirements and provisions than can courts of law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327-28 (2015). On the court's reasoning, it would have been unlawful for the agency in the first instance to calculate a Star Rating on the basis ordered by the district court, where none of the measures' technical specifications were promulgated "by regulation" and a subset were substantively deficient as well. The court

therefore could not require the agency to do so through injunctive relief. *See United States v. Coastal Ref. & Mktg., Inc.*, 911 F.2d 1036, 1043 (5th Cir. 1990) ("A court in equity may not do that which the law forbids.").

The inequity of this result is highlighted by the outcome here. The district court ordered CMS to calculate and disseminate to millions of Medicare beneficiaries a Star Rating that, while purporting to provide an objective measure of plaintiff's plans, incorporates only the metrics that plaintiff handpicked after knowing how it had scored. Not only does that mislead consumers about the quality of plaintiff's plans; it also undercuts the comparative purposes of the entire Star Rating system, as plaintiff alone was allowed to hand pick the measures it wanted to be scored on after it knew all of its measure scores. For both reasons, the relief ordered was an abuse of discretion. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) ("consideration of the public interest" is "pertinent in assessing the propriety of any injunctive relief"); *Di Giovanni v. Camden Fire Ins. Ass'n*, 296 U.S. 64, 73 (1935) (the "consequences of the court's grant of equitable relief" have "an important bearing on the exercise of the judicial discretion" in "determining whether it should grant or withhold an [equitable] remedy").

2. The district court's order independently ran afoul of the APA, which requires courts to take "due account … of the rule of prejudicial error." 5 U.S.C. § 706. As this Court has explained, in order to "understand whether [an agency]'s error was harmless, we must understand precisely how the [agency] erred." *United States v. Schwarzbaum*, 24 F.4th 1355, 1366 (11th Cir. 2022). Here, even assuming it was error to consider data outside of § 1395w-22(e) in calculating plaintiff's Star Rating, that error was harmless because the net result of that error left plaintiff no worse off. *See Salmeron-Salmeron v. Spivey*, 926 F.3d 1283, 1287 (11th Cir. 2019). As noted above, while plaintiff only asked the district court to invalidate 10 measures that used data other than those collected under § 1395w-22(e), 7 additional measures applicable to plaintiff also rely on other data. If all 17 measures that relied on other data had been excluded from plaintiff's score, its Star Rating would have remained unchanged at 3.5. In other words, the error identified had "no bearing" on "the substance of [the] decision reached," because plaintiff benefited from that error just as much as it was harmed. *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1224 n.13 (11th Cir. 2015).

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's summary judgment decision and remand with instructions to dismiss for improper venue or, in the alternative, for further proceedings.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

THOMAS PULHAM
JACK STARCHER
*Attorneys, Appellate Staff*
*Civil Division, Room 7515*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8877*
*john.e.starcher@usdoj.gov*

*Of Counsel:*
*ROBERT FOX FOSTER*
*Acting General Counsel*
*ELIZABETH C. KELLEY*
*Deputy General Counsel*
*Chief Legal Officer for CMS*
*BETSY M. PELOVITZ*
*Associate General Counsel*
*MICHAEL J. GERARDI*
*Deputy Associate General Counsel*
*For Litigation*
*ALEXANDER R. WHITE*
*KENNETH R. WHITLEY*
*Attorneys*

August 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,983 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Jack Starcher*
Jack Starcher

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Jack Starcher*
Jack Starcher

**ADDENDUM**

## TABLE OF CONTENTS

42 U.S.C. § 1395w-22 .................................................. A1

42 U.S.C. § 1395w-23 .................................................. A3

42 U.S.C. § 1395hh .................................................. A4

**42 U.S.C. § 1395w-22**

**§ 1395w-22. Benefits and beneficiary protections**

**(a) Basic benefits**

(1) Requirement

(A) In general

Except as provided in section 1395w-28(b)(3) of this title for MSA plans and except as provided in paragraph (6) for MA regional plans, each Medicare+Choice plan shall provide to members enrolled under this part, through providers and other persons that meet the applicable requirements of this subchapter and part A of subchapter XI, benefits under the original medicare fee-for-service program option (and, for plan years before 2006, additional benefits required under section 1395w-24(f)(1)(A) of this title).

(B) Benefits under the original medicare fee-for-service program option defined

(i) In general

For purposes of this part, the term "benefits under the original medicare fee-for-service program option" means, subject to subsection (m), those items and services (other than hospice care or coverage for organ acquisitions for kidney transplants, including as covered under section 1395rr(d) of this title) for which benefits are available under parts A and B to individuals entitled to benefits under part A and enrolled under part B, with cost-sharing for those services as required under parts A and B or, subject to clause (iii), an actuarially equivalent level of cost-sharing as determined in this part.

* * *

**(e) Quality improvement program**

(1) In general

Each MA organization shall have an ongoing quality improvement program for the purpose of improving the quality of care provided to enrollees in each MA plan offered by such organization.

* * *

(3) Data

(A) Collection, analysis, and reporting

(i) In general

Except as provided in clauses (ii) and (iii) with respect to plans described in such clauses and subject to subparagraph (B), as part of the quality improvement program under paragraph (1), each MA organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality. With respect to MA private fee-for-service plans and MSA plans, the requirements under the preceding sentence may not exceed the requirements under this subparagraph with respect to MA local plans that are preferred provider organization plans, except that, for plan year 2010, the limitation under clause (iii) shall not apply and such requirements shall apply only with respect to administrative claims data.

* * *.

(B) Limitations

(i) Types of data

The Secretary shall not collect under subparagraph (A) data on quality, outcomes, and beneficiary satisfaction to facilitate consumer choice and program administration other than the types of data that were collected by the Secretary as of November 1, 2003.

(ii) Changes in types of data

Subject to subclause (iii), the Secretary may only change the types of data that are required to be submitted under subparagraph (A) after submitting to Congress a report on the reasons for such changes that was prepared in consultation with MA organizations and private accrediting bodies.

(iii) Construction

Nothing in the subsection shall be construed as restricting the ability of the Secretary to carry out the duties under section 1395w-21(d)(4)(D) of this title.

**42 U.S.C. § 1395w-23**

**§ 1395w-23. Payments to Medicare+Choice organizations**

**(a) Payments to organizations**

**(1) Monthly payments**

**(A) In general**

Under a contract under section 1395w-27 of this title and subject to subsections (e), (g), (i), and (l) and section 1395w-28(e)(4) of this title, the Secretary shall make monthly payments under this section in advance to each Medicare+Choice organization, with respect to coverage of an individual under this part in a Medicare+Choice payment area for a month, in an amount determined as follows:

* * *

**(o) Applicable percentage quality increases**

* * *

**(4) Quality determinations for application of increase**

**(A) Quality determination**

The quality rating for a plan shall be determined according to a 5-star rating system (based on the data collected under section 1395w-22(e) of this title).

* * *

**42 U.S.C. § 1395hh**

**§ 1395hh. Regulations**

**(a) Authority to prescribe regulations; ineffectiveness of substantive rules not promulgated by regulation**

**(1)** The Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter. When used in this subchapter, the term "regulations" means, unless the context otherwise requires, regulations prescribed by the Secretary.

**(2)** No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).

* * *